4090726 for the Appellant, Ms. McGrath, and for the Appellee, Mr. Martinkus, you may proceed. Thank you, Your Honor. May it please the Court, Counsel. Your Honors, I'd like to focus in on three major errors I believe the trial court made, which amounts to an abuse of the trial court's discretion. The first being that the Court failed to adequately consider the hugely disproportionate distribution of the assets between the parties. The second being that there was no evidence to support a $17,000 a month maintenance award. And in fact, as I will focus in on, the evidence was to the contrary. And finally, the evidence did not establish the fact of the trial court's conclusion that a $17,000 maintenance award was even necessary in this case. With regard to the first issue that I'd like to cover, Mr. Nord received, as the Court concluded, anywhere from $800,000 to $860,000 of the total marital and non-marital estate. While Mrs. Nord, this was by a property settlement agreement, Mrs. Nord was awarded anywhere between $2.3 and $2.4 million. The parties had entered into that agreement before the Court considered the evidence on maintenance with the idea that this hugely disproportionate distribution of those assets would alleviate some obligation towards an ongoing maintenance obligation. Most important, the fact that Mr. Nord also assumed approximately $842,000 of marital debt. And the trial court didn't consider that, although it said even in the motion to reconsider argument, or hearing, that it had. I don't believe the record demonstrates that if it had, it was still an abuse of discretion to award $17,000 monthly when Mr. Nord had assumed all of that debt. His testimony, and the only testimony in the case, demonstrated he was paying $32,533 monthly to pay that marital debt off. When you look at the distribution of the assets, Mrs. Nord received 74% of all of them, and Mr. Nord received only 26% of all of them. And that's then, on top of that, he is ordered to pay $17,000 in maintenance and pay the marital debt of the roughly $842,000. When you look to the $17,000 monthly maintenance order, I think the strongest evidence, Your Honors, that it was an abuse of discretion to award that amount was Mrs. Nord's own expert, Martin Verdick, a qualified CPA, upon cross-examination and upon review of the resources that Mr. Nord had on a monthly basis. On an annual basis, he looked at his 2008 earnings. They went through all the calculations, tax deductions, his obligations to the marital debt, and Mr. Verdick himself conceded that if the court had only ordered Mr. Nord to pay $8,000 a month to Mrs. Nord, and if Mr. Nord was awarded the same amount on a monthly basis, $8,000, he, Mr. Nord, would have only had $27,000 a year in excess at the end of the year. But Mr. Verdick's calculations assumed a lower monthly payment towards those marital debts. He assumed $4,000 less, I think it was $4,300 less, monthly than what Mr. Nord was actually paying. So he wouldn't have even had the $27,000 left at the end of the year, and in fact, that testimony by their own expert demonstrates that Mr. Nord, based on the party's financial circumstances at the time of hearing, would not even pay $8,000 monthly. Your Honors, I think the testimony establishes clearly these parties did have a long marriage, 36 years, 36, 37 years. They did, for a significant period of their marriage, live a lavish lifestyle. But the cost of them living that lavish lifestyle was that they were a million dollars in debt before these hearings started. They only had $176,000 in 401k savings. So yes, they lived lavishly, but they could not afford to do it. And particularly at the time of these hearings, and significantly in advance of these hearings, they had lived in a home at one of the country clubs in Bloomington that I believe was valued at $1.6 million. But when they had to sell that house, they couldn't afford to live in it. And when they sold it, and I'm sorry, let me back up, and they also threw a million dollars into the house in renovations. But when they sold that house, they only walked away with $110,000. So yes, they lived lavishly, but their standard of living at the time of these hearings, and for a significant time towards the end of their marriage, was not a lavish lifestyle. And it could not be afforded based on the evidence that was presented during these hearings. When we look to the resources that Mr. Martin Burdick even talked about, Mr. Nord's 2008 earnings were approximately $813,000. Less taxes, that's around $504,000. Less the annual debt that he was paying, which was in excess of $390,000. He doesn't have the money to pay these monthly maintenance obligations. He didn't then, he doesn't now. In looking to whether the $17,000 maintenance was necessary, was reasonable, I'm sorry, reasonable based on, again, their lifestyle during the marriage. I recognize that's something that needs to be considered. I've just tried to touch on how I think the evidence demonstrated, yes, they lived lavishly in the past, but they couldn't now. They just couldn't. The money is not there. Kathleen, Mrs. Nord's expert, again, Mr. Burdick, testified about her monthly expenses, which were all based on reports by Mrs. Nord, and then which were inflated based on things that she thought she wanted down the road. In other words, they weren't considered or totaled up based on the rental she was paying, but rather based on a house she intended to buy. Mr. Burdick wasn't aware that, in reaching his opinion of the maintenance amount he testified about, was not aware and did not consider that she had been awarded a $2.3 or $2.4 million in marital and non-marital monies. He did not consider whether her expenses were reasonable or whether they weren't reasonable. Her expenses at that time, in looking to his testimony, included $1,350 a month for a maid, $1,500 medical, even though there was insurance, approximately $3,000 for travel, $30,000 for clothes. Some of these expenses, which even the trial court questioned, but nevertheless, she, Mrs. Nord, also had capabilities of some earnings from the assets that were awarded to her. She was awarded a condominium in Guadalajara that, even the trial court concluded, could generate $2,500 monthly in rent. She was awarded six timeshares in different areas. The court also concluded she could earn $13,000 a year, and her farmland could generate approximately $24,000 a year. I thought the trial court found that the farm ground generated $2,300 a year. Judge, you'd have to correct me if I'm wrong, but I believe the testimony was that the farm ground could generate $250 per acre, and that it was $23,503. And if I'm inaccurate, I apologize to you. My reading of the record was that in one year, she did receive that type of money, but it had to do with settling an estate in the grain that was in an estate. And I agree with that, Your Honor. There was testimony about that. And again, I apologize if I'm not reflecting the record properly. The evidence also demonstrated, as far as the lavish lifestyle or Mr. Knorr's ability to pay such an amount, both these parties were 58 by the time this hearing came about. Mr. Knorr is a gynecologist, second oldest in town. He testified about his earnings, and the record demonstrated his earnings are decreasing. And it only goes to reason that they're going to continue to decrease. There are more practitioners in town. There are younger practitioners in town. There is less business for him. And so his earnings will continue to decrease from where they had decreased to as of 2008, when, as I believe the record reflects, he couldn't pay the $17,000 then. And he's not going to be able to pay it in the future any easier than he was then when, again, even Mr. Verdick's testimony demonstrated that inability to pay that amount. In any other case, Your Honors, I contend, where maintenance has been at issue and large amounts of maintenance, where individuals have lived lavish lifestyles, I've come across no case where there was such a disproportionate distribution of the marital assets. And I think that the court abused its discretion by not taking that into consideration appropriately and awarding a much more reasonable amount of maintenance. And that amount, I contend, Your Honors, would have been a $5,000 monthly maintenance for 60 months, and the $17,000 was clearly an abuse of discretion. I will be available for any questions. Thank you, Your Honors. Please report, counsel. Please do not get fooled on this issue of disproportionate division of property. This was an agreement Dr. Nord entered into, and in part my client gave up the following claims. He had unaccounted for income of $772,073 in 2004. He had unaccounted for income of $726,988 in 2005. He had unaccounted income of $920,500 in 2006. He had unaccounted income of $643,151. We had a great dissipation claim that we gave up. We gave it up so that we could get this case concluded. My client got some more money than he did in the property. But believe me, there was certainly quid pro quo for what Dr. Nord agreed to. Nobody forced him to enter into the agreement. He entered into it to avoid all of this issue, in my view, with his gambling. He's got $519,000 of gambling winnings and losses in 2004, $403,605 of gambling losses and winnings in 2005. And as the court, I'm sure, knows, when you file your tax returns, you can only take losses to the extent of winnings. How much he really lost, who knows? He certainly had no explanation for any of these things. If you look at, you talk about a lavish lifestyle, way beyond my comprehension, I don't understand it, but these are people who lived in a 12,000 square foot home. They had nine bathrooms, six car garage, an in-ground pool with Russian tiles, an Acapulco swim-up bar, indoor gymnasium, and on and on and on. I can go on. This was an incredibly lavish lifestyle. They had multiple condominiums in Guadalajara. They traveled to Europe. These weren't people that lived close to the cloth. They lived very, very high in the heart. If you look at his income, this is, again, a discretion issue, what the court had to look at. You had this consistent income from Dr. Knorr, 2002 $994,507, 2003 $1,162,507, before $1,655,000 and change, 2005 $1,666,000 and change, 2006 $1,576,000 and change. And then after we filed for divorce, all of a sudden we dropped from $1,576,000 to $832,787,007 and $813,031,008. Even if the judge said this, if in fact there hadn't been this drop, your maintenance would have been far greater. Keep in mind, Your Honor, that my expert, Marty Burdick, went through the analysis and testified that based upon my client's affidavit and her testimony and his review of actual spending, remarkably her numbers came to $31,298.75 per month. So when they talk about this award of $17,000 a month as being outrageous or lavish, that's only about 60% of what, in fact, Marty Burdick's numbers show. This isn't something where the court refused to account for the fact she might have, at 58, go out and get some, no background, no work history, nothing. Maybe she raised her kids, a doctor's wife, but she could apparently go out and earn something. Maybe she could build a little on her farmland. Maybe these Guadalajara, they'll try to rent a condominium in Guadalajara, Mexico. But in any event, these are all passive assets. She didn't have any income-producing assets. Dr. Knorr got those, $200,000 per year surgery center where he's going to have this income. So he gets all of the income assets. And she couldn't get it because of the nature of these assets required to be owned by the doctor. So if you look at these things, we got $17,000 out of a request at $31,298. But if you look at all of this information in light of all of the income and so forth, even if you took the 2008, I want you to look at this for one moment. This is just his income from his practice, $813,000. If you take away her $204,000, Dr. Knorr now has $609,000 to do what he wants. And Mrs. Knorr has $204,000. You have still great disproportionality. You're still getting someone who, taking his lowest figures that he's ever made for the last decade, not looking at all this other income that he's consistently had, she's still getting about 25% of gross revenues. So I don't know how this court would look at this and say that somehow the trial court abused its discretion. I mean, certainly the court had the ability to hear these witnesses. This notion about this debt is pretty remarkable. All of a sudden, after all these years, Dr. Knorr comes to court, and we find he's not paying taxes. He can't account for any of these hundreds of millions, millions of dollars he can't account for. But now somehow he's got tax debt. I think the trial court saw through this completely. Even the debt he purportedly was to have, that's going to get paid off within a year, year and a half, I don't remember the exact amount of time. So it's not a question here of whether or not Dr. Knorr can afford this or that this is unfair. This is a question of whether or not the trial court abused its discretion. I don't see how this court could conclude it did. I mean, it heard the witnesses. It saw the testimony. It looked at the exhibits. This was a lengthy trial. I mean, I remember 1,000 exhibits. It was a very contested case. Judge Butler listened to it. He came up with a fair verdict. We didn't appeal the amount of 17. That wasn't what we wanted. We didn't get it, but we can live with it. It's reasonable. And I think this is a reasonable decision by Judge Butler. Any questions? No. Thank you very much. Ms. McGrath, rebuttal. Thank you, Your Honors. Again, as I've already emphasized, the $813,000, if you just look at that income, in 2008 at the time these proceedings were taking place, and you take off what he was ordered to pay, Mrs. Knorr, you take off his taxes, as Mr. Burdick testified to, and the debt that he's paying. And the record demonstrator is going to pay that a little less than three years. But that's over $800,000 a year that he's having to pay. And if you look at the status of the earnings and the resources in 2008 at that time, he doesn't have the money to pay. Is there anything in the record that shows over what period of time the debt was accumulated? I mean, is it just sort of assumed this was accumulated over the whole marriage,  Judge, my recollection is the testimony, there was testimony about the 2005, 2006, 2007 taxes were a large bulk of what is debt, what was attributed to the spouse record. But there's still more. Yes, there is, Your Honor. Yes, there is. And that more, is that from before or during the same? I guess what I'm getting at is that one of the things that's notable is, I understand the desire to repay this debt as soon as possible and to say, well, I'm going to have an aggressive policy on that. But when that's done and you choose to pay $30,000 plus a month toward that debt, or that's what the bank requires or that's what you negotiate, that may be a question. That reduces your ability to pay maintenance in a case where maintenance is going to be paid. I mean, everybody knew that when he walked into the courtroom. So how does that fit into the formula? I mean, it's great that he's repaying the debt that he took on, but the repayment schedule is what is crimping his ability to now do the sorts of things that they did when they were married and or pay a generous amount of money. And, Your Honor, the testimony from Dr. Nord was that he was making the minimum payments. That's what he testified to. I'm not aware of any other evidence in the record to the contrary. And, yes, so he'll be done with those payments in three years. But he'll also then be 61 years old. So what's his earning capacity going to be then? When you look at his earning capacity now in 08 when he's making these payments, the only evidence was that those were the minimum payments. It can't be done. It couldn't be done. And if that were the case, if the trial court had some concerns about his ability in three years, then the trial court should have reduced the maintenance obligation until that debt was paid. And that was an argument raised. Thank you, Your Honor. Thank you. Take the matter under advice.